287 P.2d 61

Frank A. RECK, Claimant-Appellee,

v.

ROBERT E. McKEE GENERAL CON-
TRACTORS, Inc., Employer,

and

Mountain States Mutual Casualty Company,
a Corporation, Insurer, Defendants-
Appellants.

No. 5909.

Supreme Court of New Mexico.

Aug. 18, 1955.

Simms & Modrall, George T. Harris, Jr., Albuquerque, for appellants.

Joseph L. Smith, Lorenzo A. Chavez, H. A. Kiker, Jr., Albuquerque, for appellee.

SADLER, Justice.

The defendants as appellants complain on appeal of a judgment against them in favor of the plaintiff (appellee) for a workmen's compensation award for partial permanent disability of the body as a whole rather than confining the award to the statutory amount provided for injury to a scheduled member, in this case injury to the left leg at, or between, the knee and ankle.

The plaintiff (claimant) was first employed by the defendant-employer with the classification of an ironworker foreman on September 19, 1950, though he neither acted as a foreman, nor was he paid as a foreman nor was he so acting at time of the injury suffered by him as hereafter stated. He continued in such employment until December, 1951, when he was laid off. He was re-employed on April 8, 1952, working steadily until the date of his injury on October 15, 1952. On last mentioned date while working in his employer's construction yard welding hitches on trailer bumpers, the plaintiff suffered an injury to his left knee which put him off the job for several weeks, during which time he was paid his full weekly salary or wage of $115, each week.

The plaintiff's services for defendant (employer) were terminated on December 16, 1952. Following his injury he consulted his own physician, Dr. Follingstad, of Albuquerque who gave him several treatments and, then, referred him to Dr. Edward Par-

nall, an orthopedic specialist. Dr. Parnall examined plaintiff for the first time on April 7, 1953, and diagnosed his trouble as a torn cartilage, suffered when he slipped and fell, twisting his left knee. The condition of the knee seeming to demand surgery, Dr. Parnall performed an operation on the knee on April 20, 1953, about two weeks following his initial examination of plaintiff. The surgeon described the condition found to exist when the injury was exposed in the course of the operation, as follows:

"In his case I did find out there was a tear of the internal semi-lunar cartilage of the left knee. That is what is known as the medial menicus, which is a half-moon shaped cartilage, which in this case had torn, and attached itself to the inner edge."

The healing period following the operation was 12 weeks, during which time he was paid maximum compensation at the rate of $30 per week and all of his medical and hospital expenses as well. Indeed, for several weeks immediately following his injury, as stated above, the plaintiff was kept on the payroll and was paid his normal weekly salary of $115 per week.

The healing period having passed, the plaintiff was employed as an ironworker by the Austin Company, working for a short time on the Fedway Building in Albuquerque, then under construction, as a general foreman. Very soon, however, his employer transferred him to the Albuquerque Publishing Company job then under way. He stayed on that job until completion of the building. Upon completion of this building, he accepted another job as general foreman from Lembke, Clough & King, Inc., a general contracting corporation of Albuquerque.

The Lembke Company was then engaged in the construction of the Simms Building in Albuquerque. The plaintiff remained on this job from October, 1953, until May, 1954, at a salary in excess of what he was receiving from defendant, the McKee Company, at the time of his injury. With the completion of the ironwork on the Simms Building nearing, the plaintiff was offered a job as an ironworker foreman by F. E. Bratton, ironworker contractor in Albuquerque, which job he took and was still holding at the time of the trial.

The trial judge submitted the matter of plaintiff's claim to the jury which returned a verdict in his favor, reading:

"We, the Jury, find the issues in favor of the Claimant and find that his accident caused him permanent partial disability which extended beyond the left leg to his other bodily functions and disabled him in the amount of *47* percent."

A judgment conforming to the verdict was entered on July 28, 1954, against the

defendants, employer and insurer, the pertinent paragraph of which is, as follows:

"It is therefore ordered, adjudged and decreed that the claimant do have and recover from the defendants 47% of $30 a week commencing the 15th day of October, 1952 and continuing until the further order of the Court but in no event to exceed 550 weeks."

In addition to the award for claimant's personal benefit, the court gave him judgment in the sum of $1,250 as attorneys' fees for the benefit of the attorneys representing him in the prosecution of this claim. This appeal followed in which the defendants ask a reversal and the award of a new trial.

The principal question presented and argued is the claim urged upon us by defendants' counsel that the evidence is wholly lacking to support any award for bodily injury beyond that accruing to the left knee. They point out that the scheduled awards for the loss of a leg above the knee and below the knee, as set out in 1953 Comp. § 59–10–18, are, as follows:

"(30) One leg at or above the knee where stump remains sufficient to permit the use of an artificial limb, 130 weeks

"(31) One leg between knee and ankle, 120 weeks"

It is pointed out by counsel for the defendants that had claimant suffered a complete severance of his left leg at the knee he would have been entitled to compensation of $30 per week for only 130 weeks, or a total of $3,900. Yet by the jury verdict he is to receive $7,755, or $3,855 more than is called for by the award for the only scheduled injury that suggests itself as applicable. They insist there is no basis in the evidence for such an award as the jury made. Thus is presented the major legal question we are called upon to decide. It was presented below by appropriate motion for directed verdict and for new trial and is here made the basis of the chief claim of error. We have given the matter the most careful consideration. Yet, notwithstanding some misgiving and an understandable reluctance which have pointed the decision first this way and then that, we are finally convinced it was for the jury and not ourselves to say where the truth lay and bring in its verdict accordingly. Having done so, we are bound by that conclusion and may not overturn the verdict, however strongly we may feel that, had we occupied the jury box, we should have brought in a different verdict.

The principal issue on the facts resolved around the injury to his back which plaintiff claimed to have suffered from the damaged knee. Three separate doctors, orthopedic surgeons, one of whom operated on the injured knee, each in turn testified he heard of pain in the back for the first time at the trial. This is a damaging fact, if

claimant actually then suffered the pain he testified to. Nevertheless, one of the physicians mentioned testifying as an expert, gave it as his opinion that a knee injury such as plaintiff suffered could cause the pain he testified to, and is referable to the knee injury. In addition, fellow workmen told of noticing difficulty with which, following the operation, the plaintiff was able to perform heavy lifting tasks which he formerly did with ease. His weight had dropped from about 192 pounds before the injury to 175 pounds. His initial testimony concerning the back injury claimed came out, as follows:

"Q. Have you been able, at any time, to perform the usual and substantial duties of a steel worker, since your injury of October 15th, 1952? A. No, not actual working in the gang, I have tried, and I come home, as a result, with swollen knee, and pain, and I lost time quite a bit of time, because of it.

"Q. Now, when you are trying to work, what sensation, if any, do you have, other than normal? Do you feel okeh, all of the time, or do you have any pain? A. No, I don't. I am always bending, or having to bend my knee, and it is always aching, and I just haven't felt right.

"Q. And is the pain you have, confined to your knee? A. Well, I have had—I don't know whether it has any-

thing to do with it, but my back bothers me, sometimes, a little. Mornings, when I get up, I can hardly put my foot to the floor. Of course, I have to move around an hour or so, then it limbers up, pretty good.

"Q. And where does it bother you? Just what part of you? A. You mean my back?

"Q. Yes, the small of your back? A. My back, way down low.

"Q. You say you have trouble bending over, what do you mean by that? A. Well, it is kind of stiff.

"Q. Through the back? A. Yes. Way down the small of the back."

It is unnecessary, however, to attempt to glean from the record all bits of testimony bearing on the vital issue of whether the plaintiff actually had an injury to his back which was traceable to the injury to his left knee. Suffice it so say, however, and speaking figuratively, by sifting the record with a fine tooth comb, as claimant's counsel have done, they have been able to come up with enough evidence to meet the test of substantiality.

It is insisted by counsel for defendants, however, that under the doctrine of James v. Hood, 19 N.M. 234, 142 P. 162, 163, the district judge should weigh the evidence and

"where it clearly appears that the jury have failed to respond truly to the real merits of the controversy, and justice has not been done, he should unhesitatingly set the verdict aside."

In other words, counsel would have us apply the doctrine they read from this case. Succinctly put counsel's position is that in ruling upon the claim of error on the trial court's action in denying their motion for new trial, viz., that it abused its discretion in so doing, we are not confined to an application of the substantial evidence rule. On the contrary, they assert we may consider all the evidence to see whether it truly preponderates in favor of the verdict and if it appears to be manifestly wrong, we should not hesitate to hold the denial an abuse of discretion and set aside the verdict. They claim the doctrine of James v. Hood, supra, is that embraced in the text found in 4 C.J.S., Appeal and Error, § 387(b), page 832, which they quote, as follows:

"In the majority of the states the general rule is that the appellate court cannot review the evidence for the purpose of determining whether it sustains the verdict of the jury unless a motion for a new trial properly presenting that ground was made in the court below, and that in the absence of a motion for a new trial review is limited to the question whether there was any substantial evidence to support the verdict".

It is our considered judgment, however, that the true rule to be deduced from James v. Hood, supra, is the appraisal given it in Noble v. McKinley Land & Lumber Co., 31 N.M. 453, 247 P. 548, 549, where speaking through the late Mr. Justice Bickley for the full court, we said:

"The assault which the appellant makes upon the plaintiff's evidence is principally that it is unreliable because not supported by adequate records; because in certain instances it was inconsistent with other testimony offered by plaintiff; because plaintiff changed his evidence, being forced to acknowledge mistakes he had made therein; because he changed his method of computation of the amounts due for the services rendered; and because such evidence was vague and uncertain and contradicted record evidence.

"These criticisms might very properly affect the weight to be given to the testimony, and were doubtless argued to the jury in an effort to induce them to minimize the weight to be attached thereto, and they might have been urged as reasons for the trial judge to direct a verdict for the defendants, or set aside the judgment and grant a new trial; but they do not have much force with us here. In

James v. Hood, 19 N.M. 234, 142 P. 162, we pointed out the difference between the functions of the trial court with respect to considering the weight of the evidence and the function of the appellate court in this respect; and it was there pointed out that a verdict of the jury unsuccessfully assailed in the trial court comes to us, not only with the approval of the jury, but with the approval of the trial court, who has, after carefully considering the evidence with every opportunity which the jury had of determining its weight and credence, given its approval of the same."

 And, where, as here, the weight to be given plaintiff's testimony rests primarily on its truth—an issue of veracity— the trial court's action in denying a motion for new trial, after seeing and observing the witnesses as they testified, is not to be lightly ignored or brushed aside. Of course, if the injury complained of is limited to a scheduled member, the employee can only have what is provided by the statute. On the other hand, if general bodily impairment and disability extend beyond the scheduled member then compensation is allowable for the total or partial permanent disability shown. Lipe v. Bradbury, 49 N.M. 4, 154 P.2d 1000.

Always, the big question is the truth of claimant's testimony. Is he speaking the truth or is he malingering? It is not out of place to say there is a progressively increasing number of cases coming before this court in which scheduled injuries are sought to be converted into those representing total or partial permanent disability. It is, therefore, not surprising if we look askance at such an effort, where the claimant was able to earn and receive his customary wage from the time his healing period ended to the date of trial, over which time he was continuously employed, and never complained of a back injury to any one of three physicians who attended him, one of whom operated on his injured knee and attended him until recovery.

But if he spoke the truth, he was entitled to compensation for partial permanent disability. Obviously, the jury believed him. The trial judge must have believed he did, an inference fairly arising on his denial of motion for new trial. After all, correction of whatever abuse may exist in the prosecution of claimed rights to compensation for injuries to scheduled members, with special reference to unwarranted efforts to convert them into cases of total or partial permanent disability in enlargement of compensation payable, resides in large measure with the trial judges throughout the state. This is so by reason of the sanctity attending their findings, in court trials without a jury, if challenged before us on appeal; or, inher-

ent in their approval of the verdict when motion for new trial is denied.

The next claim of error presented by counsel for defendants is embodied in the following proposition, to-wit:

"Compensation benefits for permanent partial disability commence after the injury has healed."

The claimed error grows out of the trial court's action in allowing compensation to run from October 15, 1952, when claimant was injured, notwithstanding the fact that he was paid maximum compensation throughout the healing period of 12 weeks, ending July 20, 1953, following his operation on April 20, 1953.

Defendants' counsel say they do not dispute that plaintiff was entitled to weekly compensation benefits for temporary total or temporary partial disability immediately following injury to the time of the operation, if it had been asked for. They assert, however, it is now too late for him to seek this compensation since no such issue was presented to the jury, nor was any award made by it in this behalf. They call attention to the fact that plaintiff's counsel have prosecuted no cross-appeal by reason of failure to receive an award for such period and insist that a cross-appeal could not have been successfully prosecuted due to failure to have submitted to the jury the extent of plaintiff's disability for ap-

plicable period from date of injury to date of operation.

The portion of the Workmen's Compensation Act relating especially to this subject will be found in 1953 Comp. § 59–10–19, reading as follows:

"Compensation for all classes of injuries shall run as follows:

"Surgical, medical and hospital services and medicines, as provided in this section. After the first seven (7) days, compensation during temporary disability lasting less than four (4) weeks from date of injury and provided that after four (4) weeks from date of injury if the workman continues to be temporarily disabled, then also for the first seven (7) days, until the injury has healed, and thereafter compensation as provided in this act * * * as amended according to the condition of permanent total or permanent partial disability the workman has suffered as a result of the injury."

Plaintiff's counsel place chief reliance for the position taken on our decision in Scofield v. Lordsburg Municipal School District, 53 N.M. 249, 205 P.2d 834. The holding we made in that case touching a kindred claim is so well epitomized in the fourth paragraph of the syllabi that we quote it, as follows:

"Where claimant was injured on August 19, 1946, and, as a proximate

result of injury, and due to complications that followed, leg was amputated on August 13, 1947, award at statutory rate of $18 a week for period from August 26, 1946, seven days after injury, to August 13, 1947, for temporary total disability, and in addition like weekly amounts for 130 weeks for loss of leg by amputation, was proper over objection that compensation may not be had both for temporary and permanent disability and that court should have deducted from award for loss of leg, amount paid for temporary disability prior to amputation."

The governing statute, 1941 Comp. § 57-919, as amended by L.1937, c. 92, § 10, then provided as follows:

"Compensation for all classes of injuries shall run consecutively and not concurrently as follows:

"Surgical, medical and hospital services and medicines, as provided in this paragraph (section). After the first seven (7) days, compensation during temporarily disability. Following both, either or none of the above, if death results from the accident, funeral expenses as hereinbefore provided following which compensation to dependents, if any."

Not only was the statute as it then stood different from its present form but, in addition, the controversy rested on an entirely different factual situation. The claimant, Scofield, had suffered an amputation of the right leg above the knee. Then as now, the scheduled award for such a loss was 130 weeks. What the trial court did was to award the claimant compensation at the statutory rate of $18 per week from August 26, 1946, seven days after the injury, to August 13, 1947, date of amputation, for temporary total disability. In addition, it made an award in like weekly amounts for 130 weeks for the loss of one leg by amputation above the knee.

The contention of defense counsel in that case was set forth in the opinion in their own language, as follows:

" 'The claimant can recover for the permanent disability, or could recover for the temporary disability. He could recover for the temporary disability and for the permanent disability, provided that the time given for temporary disability is deducted from the time given for the permanent disability, as such would mean, in effect, just one award.' "

Our disposition of defendant's claim in this behalf is succinctly summarized in this language from the opinion, to-wit:

"The trial court did not err in declining to deduct from the scheduled award for loss of one leg above the

knee the amounts paid plaintiff for temporary total disability prior to amputation. 71 C.J. 830; 58 A.J. 786; Curtis v. Hayes Wheel Co., 211 Mich. 260, 178 N.W. 675; In re McConnell, 45 Wyo. 289, 18 P.2d 629, 632, 88 A.L.R. 376, and annotations at 385."

We do not consider our decision in the Scofield case authority for the claim now asserted by counsel for defendants to begin payment of claimant's award for partial permanent disability in such a fashion as to have it cover the healing period of 12 weeks for which defendants already had paid him maximum compensation of $30 per week for exactly the same period.

■ The defendants do not dispute that claimant would have been entitled to an award of compensation from date of injury to time of operation had the issue been properly presented to the jury. No doubt, had claim for temporary total or partial disability covering this period been made, followed by adequate proof, an award in such behalf would have been made. Possibly, a reason for not making the claim, or failing to request submission of the issue, derived from the fact that, for the entire period claimant was off work incident to his injury while in the McKee Company's employ, he was paid his full wage of $115 per week. At any rate, no request for such an award was made and the jury had no such

issue before it. Nor is there any cross-error assigned to the failure to make such an award. It can not be made here for the first time.

■ This leaves for decision the question whether the trial court was correct in awarding compensation for partial permanent disability, viz., 47 per cent. of $30 per week payable over the 12 weeks healing period for which plaintiff already had been paid maximum compensation of $30 per week. A mere statement of the proposition furnishes its own answer. Of course not. So it is that the award for partial permanent disability should date from the end of the healing period, or from July 20, 1953. The plaintiff should not be paid twice for this same period.

Finally, the defendants complain of the trial court's action in assessing against them the cost of jury fees for two days plus the filing or docket fee. If the court assessed any such costs against the defendants, we fail to find a record of same and counsel point to none. Nevertheless, both parties arguing the question as if the court had done so, we shall proceed on the assumption it has and decide the question presented.

The pertinent statutes dealing with the question are as follows:

1953 Comp. § 59–10–13 reads:

"No costs shall be charged, taxed or collected by the clerk, except fees for witnesses who shall attend upon such subpoenas, who shall be allowed the same fee for attendance and mileage as is fixed by law in civil actions, and such per diem to such clerks, or the person appointed by the court for the taking of such testimony, as may be allowed by such court, not to exceed five dollars ($5.00) per day, and fees per diem of any physician directed by the court to make an examination of the workman injured, not exceeding five dollars ($5.00) for such examination and the same fees and mileage as allowed other witnesses."

The following paragraph (added to the Act by 1953 amendment) goes on to provide for interrogatories, discovery, etc., but

" * * * in no event shall any unsuccessful claimant be responsible for the cost or expense of any such interrogatory, discovery or deposition ordered by the court."

1953 Comp. § 59–10–16, provides:

"Any final order made or judgment rendered * * * shall be reviewable by the Supreme Court, * * *

"In case such cause is taken to the Supreme Court by the workman, or the person appointed by the court to act on behalf of the dependants, he shall be entitled to the record of the hearing and proceedings in said cause, and all papers on file in the office of the clerk of the district court, to be prepared, transcribed, certified and forwarded by said clerk * * * without cost to the injured workman. * * * No docket fee or other costs shall be charged such workman or representative on any such appeal or writ of error, nor shall he be required to furnish printed briefs or records. The Supreme Court shall have power to make rules governing procedure or such appeals."

It is strongly urged upon us by counsel for defendants that the language of 1953 Comp. § 59–10–13 that "no costs shall be charged, taxed or collected by the clerk" is clear and unambiguous, requires no interpretation and should be given effect by the court. We have many cases so holding. See Anderson v. Reed, 20 N.M. 202, 148 P. 502, L.R.A.1916B, 862, and Vukovich v. St. Louis, Rocky Mountain & Pacific Co., 40 N.M. 374, 60 P.2d 356, a workmen's compensation case in which this cardinal rule of construction was applied.

It is argued by counsel for plaintiff that one may read from the statute as a whole, particularly those sections relating to the subject of costs, that the exemption from costs was intended primarily for benefit of

the workman and was not intended to give a "free ride" on costs to employers and insurers. Hence, interpretation is invoked to give effect to claimed legislative intent. In order to do so, we must hurdle or strike down a cardinal rule of construction by disregarding the plain and unambiguous language of section 59–10–13, quoted supra.

Costs are a creature of statutes and may not be imposed in the absence of clear legislative authorization. In re Marron & Wood, 22 N.M. 501, 165 P. 216. Compare State ex rel. Stanley v. Lujan, 43 N.M. 348, 93 P.2d 1002; Givens v. Veeder, 9 N.M. 405, 54 P. 879; Alexander Hamilton Institute v. Smith, 35 N.M. 30, 289 P. 596. We find no authority in the statute involved for imposing the items of cost mentioned on the defendants. The trial court erred in doing so, if it did. If the plaintiff paid them he did so on his own volition and may not recover same from defendants.

It may not be out of place to inquire by what authority, even if these costs should be held taxable against defendants as claimed, the jury fees were taxed at $60 per day instead of $36 per day, as provided by 1953 Compilation, §§ 21–1–1(38b) and 21–8–14.

True enough, 1953 Compilation, § 19–1–41, L.1949, c. 7, § 1, increased the per diem of jurors from $3 to $5 per day. The amendment left standing in full force and effect, however, the two statutes first above mentioned. It was no doubt oversight or inadvertence on part of the legislature not to amend the sections mentioned at the time of increasing the fee of jurors to bring them into harmony with the later act. But are the courts to supply the omission? See Vukovich v. St. Louis, Rocky Mountain & Pacific Co., supra.

It follows from what has been said that the judgment reviewed will be reversed and the cause remanded to the district court with a direction to it to set said judgment aside and order a new one dating the commencement of plaintiff's weekly compensation of 47 per cent. of $30 a week from July 20, 1953, to continue until the further order of the court but in no event to exceed 538 weeks, and disallowing, also the filing fee and jury fees for two days taxed as costs against defendants.

The plaintiff has asked for an additional allowance to him for the benefit of his attorneys. In view of the generous allowance already made by the trial court for services there, we will award an additional amount of $400 for the purpose mentioned.

It will be so ordered.

COMPTON, C. J., and LUJAN and McGHEE, JJ., concur.

KIKER, J., not participating.